UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| JAMES E. CARTER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1-05-CV-72 |
| | ) | |
| JO ANNE BARNHART, | ) | EDGAR/CARTER |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner of Social Security denying the plaintiff

supplemental security income under Title XVI of the Social Security Act.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the

disposition of:

    (1)      The plaintiff's Motion for Judgment on the Pleadings (Doc. 16)

    (2)      The defendant's motion for summary judgment (Doc. 18)

For the reasons stated herein, it is RECOMMENDED the decision of the Commissioner

be AFFIRMED.

### Plaintiff's Age, Education, and Past Relevant Work Experience

At the time of the ALJ's decision, Plaintiff was 34 years old and had a seventh grade

education with a background in special education (Tr. 62). He had worked in the past as a

laborer, deliverer, short order cook, and cashier/gas station attendant (Tr. 69, 74).

Applications for Benefits

On February 6, 2003, Plaintiff filed his SSI application alleging that he became disabled on December 20, 2002 due to diabetes, arthritis, hip problems, circulation problems, depression, and chronic bronchitis (Tr. 62-65, 68). Administrative Law Judge (ALJ) Ronald J. Feibus held a hearing on August 10, 2004, at which Plaintiff, who was represented, and a vocational expert testified (Tr. 355-80). On August 25, 2004, the ALJ issued a decision finding Plaintiff was not disabled and denying his application for SSI (Tr. 14-22). With the Appeals Council's denial of Plaintiff's request for review, the ALJ's decision became final (Tr. 5). This Court has jurisdiction of the action under 42 U.S.C. § 405(g).

Standard of Review - Findings of ALJ

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The burden of proof in a claim for social security benefits is upon the claimant to show disability. *Barney v. Sec'y of Health & Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once the claimant makes a prima facie case that he cannot return to his former occupation, however, the burden shifts to the Commissioner to show that there is work in the national economy which claimant can perform considering his age, education, and work experience. *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply

2

the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986).

As the basis of the administrative decision of August 25, 2004, that plaintiff was not disabled, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability (20 CFR § 416.920(b)).

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the regulations (20 CFR § 416.920(c)).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his subjective limitations are not totally credible for the reasons set forth in the body of the decision.

3

5.     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6.     The claimant has the residual functional capacity described above in the decision (20 CFR § 416.967).

7.     The claimant is unable to perform any past relevant work (20 CFR § 416.965).

8.     The claimant is a younger individual (20 CFR § 416.963).

9.     The claimant has a seventh grade education (20 CFR § 416.964).

10.    The claimant has no transferable skills from any past relevant work (20 CFR § 416.968).

11.    Although the claimant's limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.25 as a framework for decision-making, there are a significant number of jobs in the national economy the claimant could perform.  Examples of such jobs include: inspector (300 jobs locally and 25,000 nationally), packer (300 jobs locally and 25,000 nationally), and assembler (300 jobs locally and 25,000 nationally).

12.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

(Tr. 21, 22).

## Review of Evidence

### Issues

Plaintiff raises the following issues:

I.     The ALJ erred by disregarding the medical opinions of Dr. Cyleman regarding Plaintiff's disabling symptoms from his physical impairments.

II.    The ALJ erred in disregarding Dr. O'Hanlon's opinion regarding Plaintiff's disabling symptoms from depression and anxiety.

III.   The ALJ erred in finding that Plaintiff was not a credible witness.

IV.     The Commissioner's decision below should be reversed outright with a payment of
        benefits because the record overwhelmingly supports disability.

Relevant Facts

<u>Medical Evidence</u>

*Evidence From Before Alleged Onset of Disability, December 20, 2002*

On January 1, 1998, Plaintiff went to the emergency room for pain in his peroneal (outer side of the leg) area with discomfort when he urinated and informed that he had recently been treated for prostatitis (Tr. 167). After examination, James Wojcik, M.D. assessed prostatodynia (Tr. 166). Dr. Wojcik noted that he had spoken with Plaintiff's physician of one year, Dr. Finley, and wrote he suspected Plaintiff's complaints had "secondary gain."

> [Dr. Finley] says he does not know which way to turn at this point. He, himself, cannot seem to find anything wrong with the patient despite the patient's persistent complaints of pain, both to his perineum and when I just went back out and talked to him, I should add, he now starts to complain of pain to his back, legs, and generally his total body. He states his discomfort is so severe he is unable to work. My ultimate impression after examining the patient and after talking with Dr. Finley is that there may be some secondary gain involved here in his persistence in stating that this pain is too severe for him to hold a job (Tr. 165).

On January 2, 2000, Plaintiff, who weighed 260 pounds and was 70 inches in height, went to the emergency room complaining of episodic chest pain, fatigue, and sweats (Tr. 150, 161). Francis Fesmire, M.D. made normal findings in the cardiac and musculoskeletal examinations, observed that he ambulated without distress, and assessed recurrent diaphoresis (excessive sweating) of unknown etiology, with no evidence of coronary syndrome or hyperthyroidism (Tr. 151, 161). On November 26, 2001, Plaintiff complained of left-hip pain to S. Farhan Rizvi, M.D., but an X-ray was normal (Tr. 248-49).

5

On February 27, 2002, Plaintiff underwent bilateral carpal tunnel surgery, and two days later his fingers had good sensation and movement and his wrist pain was resolving (Tr. 145, 148). Plaintiff went to the emergency room on December 7, 2002, reporting dull, constant pain in the ball of his left foot, but an X-ray was normal (Tr. 183,188). Three days later, Plaintiff returned to the emergency room for pain and cramping in his left foot (Tr. 174). Upon examination, Robert Alan Coles, M.D. found fairly minimal swelling on the left, some tenderness to palpation over the sole, and elevated blood pressure (Tr. 174). X-rays showed no acute left foot abnormality and Dr. Coles assessed gout and hyperglycemia (Tr. 175).

*Evidence After Alleged Onset Date of Disability, December 20, 2002*

At the referral of Dr. Rizvi, Plaintiff visited with podiatrist Ira Kraus on January 23, 2003 (Tr. 190-91). Upon examination, Dr. Kraus found he was overweight, and he had normal muscle strength in his arms and legs and tenderness at the base of his fourth metatarsal, and to a lesser degree, at the plantar fascia and achilles tendon (Tr. 191). X-rays showed previous fractures at the left fourth metatarsal, a small osteophyte, and degenerative joint disease[1] (Tr. 191). Dr. Kraus observed no arthritic changes in any other joint, no soft tissue abnormalities, and normal bone density (Tr. 191). He diagnosed left foot post traumatic arthritis, plantar fascitis and Achilles tendinitis and discussed diabetic foot care and the possibility of injections (Tr. 191).

On April 7, 2003, Plaintiff complained of low back pain and, after examination, of which the findings are not legible, Dr. Rizvi diagnosed diabetes mellitus ("dm") and degenerative joint

---

[1]Degenerative joint disease is another term for osteoarthritis, seen mainly in older persons and characterized by degeneration of articular cartilage, hypertrophy of bone, and synovial membrane changes. *The Merck Manual* 449 (Mark Beer, M.D., et al. eds., 17th ed. 1999); *Dorland's Illustrated Medical Dictionary* 1286 (28th ed. 1994) [*Dorland's*].

disease ("djd"), and added Naprosyn to his medication regimen (Tr. 232). Magnetic resonance imaging (MRI) of Plaintiff's lumbar spine showed minimal desiccation (drying up) (*see Dorland's* at 483) of the L4-5 disc, with no disc bulging or herniation (Tr. 231).

On April 15, 2003, Plaintiff underwent a consultative examination at the request of the state agency with William A. Holland, M.D. (Tr. 194). Upon examination, Dr. Holland noted that Plaintiff, who was 282 pounds, was obese, but ambulated without any noticeable difficulty and got on and off the examination table without assistance (Tr. 193). Plaintiff had normal range of motion in his shoulders, elbows, wrists, and hands, no evidence of muscle atrophy in his hands, and normal grip strength bilaterally (Tr. 193). Plaintiff had normal range of motion in the hips, knees, and ankles, and his straight-leg raise was negative (Tr. 193). Plaintiff had no joint inflammation or edema in his feet (Tr. 193). His lower back had flexion to 90 degrees, extension to 20 degrees, and lateral flexion to 20 degrees bilaterally (Tr. 193). Station and gait were adequate (Tr. 194). Dr. Holland opined that Plaintiff had "no physical limitations" (Tr. 194).

Three days later on April 18, 2003, Plaintiff participated in a psychological evaluation at the request of the state agency with David J. Caye, M.S. (Tr. 196-200). Plaintiff reported having emotional difficulties and that his wife had been recently diagnosed with cancer (Tr. 196). He told Mr. Caye that his days were "very active," as he brought his wife to appointments for cancer treatment (Tr. 197). He washed dishes and fixed himself soup and sandwiches, but he did little else (Tr. 198). During the day, he napped, talked with his mother, who lived with him and his wife, and watched television (Tr. 198). He mowed the lawn as necessary, which now took him all day, and visited with friends or family who stopped by (Tr. 198). He drove (Tr. 198).

Mr. Caye observed that Plaintiff walked slow and with a slight limp, and he sat

comfortably in the chair (Tr. 198).  He answered questions in a relevant, coherent, and

goal-directed manner (Tr. 198).  Plaintiff was alert, his insight was adequate, and his reasoning

and judgment were stable; he was polite and cooperative (Tr. 198).  Plaintiff's short and long

term memory were adequate (Tr. 198).  Mr. Caye observed that Plaintiff's mood was mildly

depressed and he became tearful discussing his wife's illness (Tr. 198).  Mr. Caye administered

the Wechsler Adult Intelligence Scale-III and found that Plaintiff put forth good effort and the

results were valid (Tr. 198).  Plaintiff obtained a verbal IQ score of 85, a performance IQ of 75,

and a full scale IQ of 78, placing him in the low-average-to-borderline range of intellectual

abilities (Tr. 198).  Mr. Caye diagnosed depressive disorder, not otherwise specified, and

borderline intellectual functioning (Tr. 199).  Mr. Caye summarized that Plaintiff had past bouts

of depression related to poor stress adjustment and that he was currently showing similar

symptoms of a mild mood disorder due to his wife's illness (Tr. 199).  Mr. Caye opined that,

from a mental health standpoint, Plaintiff had no work-related functional limitations (Tr. 200).

On May 6, 2003, Dr. Kourany, a state agency psychiatrist, reviewed the record and

completed a psychiatric review technique form opining that Plaintiff's mental impairment did

not meet or equal a listed impairment (Tr. 205).  Dr. Kourany evaluated Plaintiff's mental

impairments under listings §§12.04 for affective disorders and 12.05 for mental retardation.

Assessing the "B" criteria, Dr. Kourany found Plaintiff had mild restriction of daily living

activities, moderate difficulties in maintaining social functioning and in maintaining

concentration, persistence or pace, and no episodes of decompensation (Tr. 215).  Dr. Kourany

opined that the evidence did not support the presence of the "C" criteria (Tr. 216).

Dr. Kourany also completed a mental functional capacity assessment opining that

Plaintiff had moderate limitations in some basic mental functions (Tr. 203). Considering the limitations, Dr. Kourany opined, "[Plaintiff] will be able to complete simple tasks and sustain persistence on same. Will interact in a distant way with the public. Will accept supportive criticism from supervisors. Will need assistance setting realistic goals" (Tr. 204).

On May 14, 2003, Plaintiff returned to Dr. Rizvi with complaints of left hip and groin pain (Tr. 228). Dr. Rizvi noted that the April 2003 MRI of Plaintiff's lumbar spine was within normal limits ("WNL"), and that Plaintiff denied weakness or numbness in his legs (Tr. 228). Upon examination, Dr. Rizvi found reduced range of motion in Plaintiff's left hip and assessed degenerative joint disease (Tr. 228). X-rays of Plaintiff's left sacroiliac joint were consistent with arthritic or inflammatory changes; his left hip and pelvis were normal (Tr. 229).

On May 24, 2003, state agency physician Dan S. Sanders, M.D. reviewed the record and completed a physical residual functional capacity assessment in which he opined that Plaintiff retained the ability to lift 50 pounds occasionally and 25 pounds frequently, to stand for about 6 hours and to sit for about 6 hours in an 8-hour work day (Tr. 220).

In a follow-up visit on June 5, 2003, Dr. Rizvi assessed that Plaintiff's X-rays were consistent with left sacroilitis (arthritis in the sacroiliac joint) (Tr. 227). Dr. Rizvi noted Plaintiff's complaints of severe pain and his wish to file for disability (Tr. 227).

On July 7, 2003, Plaintiff first visited Nabil Cyleman, M.D.[2] (Tr. 259, 311). Plaintiff weighed 288 pounds and he complained of low back pain (Tr. 259, 311). Dr. Cyleman assessed

---

[2]Dr. Cyleman's notations in his clinical notes are very difficult to read and are largely illegible.

back pain and planned to refer Plaintiff for physical therapy (Tr. 260). Plaintiff again

complained of back pain on August 7, 2003, and Dr. Cyleman found that Plaintiff's lumbar spine

was tender and counseled him on preventive measures of diet and exercise (Tr. 257-58). An

MRI of Plaintiff's lumbar spine showed minimal hypertrophic changes but was otherwise

unremarkable (Tr. 340). On August 19, 2003, Plaintiff returned to Dr. Cyleman, complaining of

low back and left leg pain and Dr. Cyleman noted tenderness in the lumbar spine (Tr. 255-56,

314-15).

On July 21, 2003, Plaintiff went to Fortwood Center seeking help for his anger and

"nerves" (Tr. 265). Social worker Matthew Clark, M.S. diagnosed major depression, recurrent,

mild, and anxiety disorder not otherwise specified and assigned a global assessment of

functioning score of 51[3] (Tr. 266).

In a Medical Opinion Form, on August 21, 2003, Dr. Cyleman opined that Plaintiff could

sit for 4-5 hours out of an 8-hour day and could sit for 30 minutes and a time, and that Plaintiff

could stand or walk for 3 hours of an 8-hour work day for 30 minutes at a time (Tr. 252). Dr.

Cyleman further opined that Plaintiff could infrequently lift or carry 1-10 pounds, bend, reach or

stand on a hard surface (Tr. 252). Dr. Cyleman wrote that Plaintiff required 1-1 ½ hours of bed

rest during a normal workday, and that he needed 2 hours of rest every 8 hours of work (Tr.

253). Given the options of "Extreme, Severe, Moderate, and Mild," Dr. Cyleman opined

Plaintiff had "Moderate" pain (Tr. 253). Dr. Cyleman affirmed that Plaintiff had a reasonable

---

[3]The Global Assessment of Functioning (GAF) scale rates an individual's psychological, social, and occupational functioning. American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. rev. text 2000) (*DSM-IV-TR*). A score of 51 falls in the range of 51-60, denoting moderate symptoms or impairment. *Id.*

medical need to be absent from full-time work on a chronic basis (Tr. 254).

On September 11, 2003, Plaintiff met with Dr. O'Hanlon at Fortwood (Tr. 261). Upon mental status examination, Dr. O'Hanlon found Plaintiff was restless and fidgeted, his speech was normal but he was anxious and depressed, and his thought process was logical (Tr. 262). Dr. O'Hanlon did not assess Plaintiff's insight or memory (Tr. 262). He affirmed the diagnoses made by Mr. Clark and prescribed Ambien and Zoloft (Tr. 263-64). On October 7, 2003, Dr. O'Hanlon assessed that Plaintiff's symptoms were stabilized as to speech, behavior, sensorium, hallucination, insight and risk. His status as to anxiety and depression were assessed to be between "poorly stabilized" and "stabilized with outpatient treatment" (Tr. 270). On October 29, 2003, Plaintiff visited Dr. Cyleman for a flu shot, and Dr. Cyleman noted that Plaintiff's bones and joints were normal ("nl") (Tr. 278-79, 319). Plaintiff visited the emergency room on November 7, 2003, for right shoulder trauma, but X-rays were normal (Tr. 343).

On November 11, 2003, Dr. O'Hanlon noted that Plaintiff was doing well on medication, though he did become depressed and anxious at times (Tr. 269, 305). On February 25, 2004, Plaintiff returned to Dr. Cyleman complaining of shortness of breath, fatigue, sore throat, headache, and difficulty sleeping (Tr. 272, 324). Dr. Cyleman found back pain and apparently diagnosed acute bronchitis (Tr. 273, 342); X-rays of Plaintiff's chest were normal (Tr. 342). On March 29, 2004, at Dr. Cyleman's referral, sleep specialist David H. Guan, M.D. met with Plaintiff and noted his reports of restless sleep and gasping for air during the night (Tr. 301). Upon examination, Dr. Guan found Plaintiff's oropharynx was crowded, his lungs were clear, his heart was normal, and his legs had no swelling (Tr. 300). Dr. Guan suspected significant obstructive sleep breathing and scheduled him for a two-night sleep study (Tr. 300).

In March and May 2004, Plaintiff told a psychiatrist at Fortwood that he had complied with medication and had no adverse reactions; in May, he said he was stable (Tr. 307-08).

Dr. O'Hanlon completed a medical source statement regarding the severity of Plaintiff's mental impairments on March 22, 2004 (Tr. 286). Dr. O'Hanlon opined that Plaintiff was markedly limited in all but one of the basic mental abilities under the three criteria of understanding and memory, sustained concentration and persistence, and adaption (Tr. 287-88). Under the criterion of social interaction, Dr. O'Hanlon opined Plaintiff had mostly moderate limitations (Tr. 288). He opined that the onset of these limitations was September 11, 2003 (Tr. 289). Dr. O'Hanlon further commented that Plaintiff's medications were being adjusted, his symptoms were not stable, and that he could not function without his medication (Tr. 289).

On April 12, 2004, Dr. Cyleman saw Plaintiff for follow up and medication refills (Tr. 298-299). After the sleep studies in April 2004, Dr. Guan diagnosed severe obstructive sleep apnea, prescribed the use of a C-PAP machine at night, and advised Plaintiff to lose weight (Tr. 295, 297). On May 3, 2004, Dr. Guan found the C-PAP machine successfully treated Plaintiff's sleep apnea (Tr. 293). Plaintiff saw Dr. Cyleman on June 1, 2004 for his strep throat (Tr. 291, 331).

On June 1, 2004, Dr. O'Hanlon completed a Medical Opinion Form regarding Plaintiff's physical limitations in which he opined that Plaintiff could sit for 3 or 4 hours, and sit for 30 minutes at one time (Tr. 283). Dr. O'Hanlon stated Plaintiff could stand or walk for 2 or 3 hours and stand or walk for 15 minutes at a time (Tr. 283). Plaintiff could occasionally lift 1 to 10 pounds and never lift 50 or more pounds (Tr. 283). Plaintiff could infrequently bend, reach, or manipulate (Tr. 283). Dr. O'Hanlon rated Plaintiff's pain as "Moderate," and opined that

Plaintiff's medication could be expected to interfere with his concentration (Tr. 284). Dr. O'Hanlon affirmed that Plaintiff had a "reasonable medical need" to be chronically absent (Tr. 285).

On July 8, 2004, Dr. Cyleman found Plaintiff had a tender lumbar spine and assessed degenerative joint disease, diabetes, and hiatal hernia (Tr. 334).

<u>Plaintiff's Testimony</u>

On August 10, 2004, Plaintiff testified that he could read and write (Tr. 360). Plaintiff lived with his wife and mother in a house (Tr. 362-63). Plaintiff's wife was being treated for breast cancer (Tr. 362). Plaintiff had a driver's license and used his mother's car (Tr. 363). Plaintiff and his wife worked together to do things around the house (Tr. 363). He prepared egg sandwiches and helped his wife do laundry (Tr. 363). Plaintiff weighed 302 pounds (Tr. 364).

Plaintiff said the biggest thing preventing him from working was his left hip and lower back (Tr. 364). He also had diabetes and high blood pressure, and was prescribed 13 medications (Tr. 365). Plaintiff did not take insulin, but took two different medications for diabetes (Tr. 365). Plaintiff had been using a C-PAP machine for two months and it helped (Tr. 366). Plaintiff wore pain patches on his back and hip (Tr. 366). Plaintiff said his medications helped to a degree, but did not "knock" out his pain completely (Tr. 367). Plaintiff said he had considered working in a non-labor intensive job but that he did not have the education for it and that he had difficulty relating to the public, he had an anger problem, and he was anxious (Tr. 367). Plaintiff said that the previous years had been difficult because of his wife's diagnosis of cancer (Tr. 368). Plaintiff also had problems with his left foot, as it had previously been broken in three places and he had arthritis (Tr. 369). He had been given cortisone injections and was

13

going to be prescribed insoles (Tr. 369). Plaintiff said his lower back pain was constant and

rated it a 7 on a scale of 1 to 10 (Tr. 369). Plaintiff said he found it difficult to stand for more

than 20 to 30 minutes at a time (Tr. 370).

III.    Discussion of the Evidence Between ALJ and Plaintiff's Counsel

     Following Plaintiff's testimony, the ALJ discussed the medical opinions:

> ALJ: Dr. [Cyleman][4] is the primary, and he says, sit for four or
> five hours, stand and walk three. I mean neither one of
> these guys [Dr. O'Hanlon or Dr. Cyleman] is likely to have
> a strong background. And all I've got here is somewhere
> back once upon a time – I'm trying to think – it was '03,
> early '03, they did a hip x-ray, and they said he has left SI
> joint abnormality. But nobody's done anything about it, no
> MRIs, no nothing . . . .
>
> Why don't they – I mean, I need more info on a left hip
> abnormality without anything more. And his own doctor is
> saying he can stand and walk, you know, eight hours a day.
> I'm kind of stuck here. One says lifting 10 pounds. The
> other says lifting 25. Who should I give weight to, the
> psychiatrist or the family doctor, neither one of whom is an
> expert in –

The ALJ and Plaintiff's counsel discussed Dr. Cyleman's opinion in light of the other evidence:

> ALJ:   Well, all right. I'm aware he can't do light. He can do a
> combination of either – either he can do all sedentary and some,
> you know, light, depending on lifting . . . in a perfect world we'd
> have some more info here. I guess we don't get that in this world .
> . . There is a 4/10/03 MRI that shows – of the lumbar spine –
> underwhelming. But I'm going to add the obesity to the foot
> problem and the hip problem to come up with sedentary work. But
> I just don't see how I can get below that, unless you give me
> something else . . . Is there anything I should be thinking about that

---

[4]In the hearing transcript, the court reporter transcribed Dr. Cyleman as "Dr. Solomon"
(Tr. 370). The ALJ is clearly referring to Dr. Cyleman, as the ALJ notes he is the "primary"
physician and recites his opinion as it appears in his report (*Compare* Tr. 370 *with* 252-53).
Furthermore, no "Dr. Solomon" appears in the record.

I haven't covered with you?

Atty:   Well, the only thing I would say is that I think he has – and, again, I agree with your assessment regarding the objective medical.  He does not have – there's not a lot of objective medical. Plus, Dr. [Cyleman]'s report are [sic] are almost impossible to read.

ALJ:   Who's that?

Atty:   Dr. Solomon.

ALJ:   Well, yes.  But I mean his own interpretations don't really sell the case to the farthest degree possible.  And there's been a couple of things to look at.  We had a CE . . .

Atty:   My whole argument would be, I don't agree with your assessment of Dr. Solomon.  I believe Dr. [Cyleman]'s report – who was his treating physician who's treating him for an extended period of time, says that he is disabled.

ALJ:   Right.  Okay.  But he says RFC, sit four to five hours, half-hours at a time, stand and walk three hours, half-hour at a time, lift ten pounds.  And I'm not going to give any credit to how much bed rest he estimates he would need.  That's just silly.

(Tr. 371-74).  The ALJ and counsel then discussed their different interpretations of the opinion and the ALJ ended the exchange by stating that he and counsel had "narrowed their differences" to where counsel would say "it's disabling" and the ALJ would say "I don't know" (Tr. 374).

IV.     Vocational Expert Testimony

The ALJ asked the vocational expert (VE), Ben Johnston, to consider an individual of Plaintiff's age, his seventh grade education with special education background, and with borderline intellect with scores in the 70s, who was limited to no more than two hours of standing and walking due to a left hip abnormality and plantar fascitis of the left foot, and who could sit for four to six hours, in half-hour increments, which would require him to alternate

15

positions (Tr. 377). The ALJ asked the VE how the requirement for alternating positions would affect the full range of sedentary work (the 200 unskilled occupations) (Tr. 377). The VE testified that 25-30% of the jobs would remain and offered the examples of inspector, assembler, and packer, all of which required lifting no more than 2 pounds and which were unskilled with a specific vocational preparation level of 2 (Tr. 377). Each of the jobs existed in numbers of 300 locally and 25,000 to 30,000 nationally (Tr. 377).

The VE stated that, if Plaintiff's testimony were credible in its entirety, he would not be able to work (Tr. 378). Plaintiff's counsel then asked the VE to consider Dr. Cyleman's opinion that Plaintiff could lift one to ten pounds infrequently (Tr. 379). The ALJ cautioned that the categories used by the form filled out by Dr. Cyleman did not match the categories usually given of "occasionally, frequently, and constantly" (Tr. 379). That is, he considered "never" and "infrequently" as "almost the same thing" (Tr. 379). Nevertheless, the ALJ invited the VE to answer (Tr. 380). The VE stated, "[W]hen somebody checks infrequently like this, very few time [sic] a day from one to ten pounds, I doubt that there would be any jobs of significant number that would exist that would let you do that with that level of impairment" (Tr. 380).

<u>Analysis</u>

I.  Did the ALJ err by disregarding the medical opinions of Dr. Cyleman regarding Plaintiff's disabling symptoms from his physical impairments?

Plaintiff first argues the uncontradicted opinion of the treating physician, Dr. Cyleman, is entitled to great weight and even complete deference but was not even mentioned in the opinion of the ALJ.

The record includes the opinion of Dr. Cyleman who, in August 2003, filled out a medical opinion form regarding Plaintiff's work-related limitations, opining that Plaintiff could

16

infrequently lift 1-10 pounds, could stand/walk for 3 hours in a work day and 30 minutes at a time, and could sit for 4 or 5 hours for 30 minutes at a time (Tr. 252). He further opined that Plaintiff required 1½ hours of bed rest, and that Plaintiff had a "reasonable medical need to be absent from full time work on a chronic basis" (Tr. 253-54). The Commissioner argues the ALJ's physical RFC finding that Plaintiff could perform sedentary work, alternating between sitting and standing, comports with Dr. Cyleman's estimation of Plaintiff's exertional limitations, except that Dr. Cyleman believed Plaintiff could lift "infrequently" (Tr. 252).[5] The ALJ's conclusion that Plaintiff is not disabled is, however, at odds with Dr. Cyleman's opinions that Plaintiff would be chronically absent or would require bed rest during the day. In his decision, the ALJ reviewed Dr. Cyleman's treatment of Plaintiff (Tr. 16), but did not address Dr. Cyleman's medical opinion form.

Generally, the treating physician rule requires an ALJ to give the opinion of a treating physician controlling weight only when it is supported by sufficient clinical findings and is consistent with the evidence. 20 C.F.R. § 404.1527(d); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993). In *Wilson v. Comm'r of Soc. Sec.,* the Court found that an ALJ must follow the regulatory requirement of giving "good reasons" for rejecting an opinion of a treating physician. 378 F.3d 541, 545 (6th Cir. 2004). There is a violation of that rule in this case because the ALJ did not specifically address the findings in the medical opinion form. But the *Wilson* Court also outlined instances in which a violation of the procedural regulatory requirements could constitute harmless error. One of these instances is when an ALJ does not give good reasons,

---

[5]The VE testified that a requirement for "infrequent" lifting of this weight would result in there being no jobs available (Tr. 380).

but the error is harmless because the ALJ's reasoning is nevertheless clear. *Cf. Hickey-Haynes v.*

*Barnhart*, No. 03-2475, 2004 WL 2725964, *5 (6th Cir. Dec. 1, 2004 ("Even assuming, for the

sake of argument, that the ALJ did not technically meet the procedural requirement to give 'good

reasons,' this was harmless error; the reasoning behind her use of each physician's opinion is

clear. *See Wilson*, 378 F.3d at 548 (suggesting that error would be harmless where 'the

Commissioner has met the goal of § 1527(d)(2) [20 C.F.R. § 927(d)(2), for SSI claims] . . . even

though she has not complied with the terms of the regulation.')").

I conclude this case meets the exception in *Wilson*. In the hearing, the ALJ explicitly

discussed Dr. Cyleman's opinion and during the hearing engaged in a lengthy discussion

regarding it with Plaintiff's counsel (Tr. 370-74). In the course of their discussion, the ALJ

reviewed Dr. Cyleman's opinion of Plaintiff's limitations in lifting, sitting, standing and

walking, as well Plaintiff's pain level (Tr. 370). The ALJ also offered a number of his

concerns regarding the opinion and, in so doing revealed his reasoning for declining to give it

controlling weight. The ALJ pointed out that Dr. Cyleman was not an expert (Tr. 370 (stating

that neither Dr. Cyleman nor Dr. O'Hanlon had "a strong background"); Tr. 371 (stating that

neither Dr. Cyleman nor Dr. O'Hanlon was "an expert")). 20 C.F.R. § 416.927(d)(5) (giving

more weight to opinions from a specialist about medical issues related to his or her specialty).

The ALJ also discussed the lack of objective findings, noting that a 2003 left hip X-ray which

showed an abnormality but that "nobody's done anything about it" (Tr. 371). *See* 20 C.F.R. §

416.927(d)(2) (controlling weight will be given to a treating source's opinion that is well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the evidence). The ALJ noted the April 2003 MRI of Plaintiff's lumbar spine

which was "underwhelming" (Tr. 372). As the Commissioner notes in her brief, plaintiff's counsel even affirmed the ALJ's concerns, stating that he agreed with the ALJ's "assessment regarding the objective medical," and that there was "not a lot of objective medical," and added, "Plus, Dr. [Cyleman's] report[s] are almost impossible to read" (Tr. 372). Finally, the ALJ also suggested that there were other reports which conflicted with Dr. Cyleman's opinion, such as the consultative examiner's report (Tr. 372, "And there's been a couple of things to look at. We had a CE . . ." (Tr. 372). *See* 20 C.F.R. § 416.927(d)(4) (the more consistent an opinion is with the record the more weight it will be given). So, although the ALJ did not discuss the reasons for rejecting Dr. Cyleman's opinion in his decision, the ALJ's exchange with Plaintiff's counsel shows his consideration of it and outlines his reasons for rejecting it.

Under *Wilson*, another of the instances in which an ALJ's failure to give good reasons as required under 20 C.F.R. § 927(d)(2) may be harmless error is when "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Wilson* 378 F.3d at 547. Here, for the reasons outlined by the ALJ in the hearing, as well as others, the deficiencies of Dr. Cyleman's opinion are such that the ALJ could not have credited it.

First, the objective evidence did not support that Plaintiff's physical conditions prevented him from working. An X-ray of Plaintiff's lower back in May 2003 showed only minimal drying of the L4-5 disc with no disc bulging or herniation (Tr. 231). Dr. Rizvi, who referred Plaintiff for the X-ray due to his complaints of lower back pain, characterized the results as being "within normal limits" and assessed only degenerative joint disease (Tr. 228). X-rays of Plaintiff's left sacroiliac joint were consistent with arthritic changes, but his hip and pelvis were normal, and Dr. Rizvi accordingly assessed arthritis (Tr. 227, 229). An MRI of Plaintiff's lower

back in August 2003, recommended by Dr. Cyleman, showed minimal hypertrophy and was otherwise unremarkable (Tr. 340). Chest X-rays in February 2004, at Dr. Cyleman's referral due to Plaintiff's bronchitis, were normal (Tr. 342). Plaintiff underwent sleep studies for his sleep apnea, but his condition was then controlled with the use of a C-PAP machine (Tr. 293). In addition, the clinical notes from Dr. Cyleman do not offer support with objective clinical findings, as they contain minimal findings (Tr. 259-60, 257-58, 255-56, 278-7, 272, 303, 299-300, 333). *See* C.F.R. § 416.927(d)(4) (regarding the supportability of an opinion).

Plaintiff's treatment does not support Dr. Cyleman's opinion of disability. As the ALJ pointed out in the hearing, X-rays showed sacroilitis, but Plaintiff did not undergo any particular treatment, besides pain medication (Tr. 371, "[N]obody's done anything about it"). Dr. Rizvi apparently planned to refer Plaintiff to an orthopedist for the sacrilitis (Tr. 227), but there is no such evaluation in the record and Plaintiff did not undergo injections or aggressive therapy. Plaintiff also did not receive aggressive treatment for his lower back pain. Although Dr. Cyleman noted in his first visit with Plaintiff in July 2003 that he planned to refer him for physical therapy, the record does not contain evidence that this therapy occurred (Tr. 260).

Additionally, Dr. Cyleman was Plaintiff's family physician rather than an orthopedist. *See* 20 C.F.R. § 416.927(d)(5). In July and August 2003, visits focused on Plaintiff's reports of leg and back pain, but later visits concerned more routine matters or other conditions: in October 2003, Plaintiff visited for a flu shot (Tr. 278); in February 2004, Plaintiff was diagnosed with bronchitis (Tr. 273, 342); in March 2004, Dr. Cyleman referred him for a sleep apnea assessment (Tr. 303); and in June 2004, Plaintiff followed up with Dr. Cyleman for strep throat (Tr. 291). Had Dr. Cyleman believed that Plaintiff's lower back or hip impairments were disabling, it is

20

reasonable to expect that he would have referred Plaintiff to an orthopedist, but he did not.

Finally, Dr. Cyleman's opinion conflicted with other opinions in the record. *See* 20 C.F.R. § 416.927(d)(4) (consider an opinion's consistency with the record as a whole). As pointed out by the ALJ, his opinion was at odds with the opinion of Dr. Holland, the consultative examiner (Tr. 372). The ALJ ultimately assigned little weight to Dr. Holland's opinion that Plaintiff did not have any physical limitations (Tr. 19). Presented with these differing opinions – Dr. Holland's opinion of no limitations and Dr. Cyleman's opinion of disability – the ALJ reasonably determined that Plaintiff could yet perform sedentary work with alternating positions.

For all of the above reasons, I conclude the lack of evaluation of Dr. Cyleman's opinion in the decision is harmless error. The ALJ's reasons for declining to give the opinion controlling weight are apparent from his discussion at the hearing. Further, the ALJ was not required to credit his opinion in light of its lack of supportability, its inconsistency with the record, and Plaintiff's minimal treatment.

II.     Did the ALJ err in disregarding Dr. O'Hanlon's opinion regarding Plaintiff's disabling symptoms from depression and anxiety?

Plaintiff next contends that the ALJ improperly disregarded or assigned little weight to the opinion of treating psychiatrist Dr. O'Hanlon. On March 22, 2004, Dr. O'Hanlon completed a medical source statement in which he opined that Plaintiff had marked and moderate limitations in all areas of mental functioning under the "B" criteria (Tr. 286). The ALJ declined to give controlling to Dr. O'Hanlon's opinion and articulated several reasons for his finding (Tr. 20). Instead, the ALJ adopted the opinion of the state agency physicians that Plaintiff could perform simple work (Tr. 18). Plaintiff points out that the state agency physicians had never examined him. However, in his decision, the ALJ refers to the opinion of Dr. O'Hanlon as

follows:

> I have also considered the mental limitations opined by Dr. O'Hanlon, but which are not supported by his mental status findings and treatment records. Dr. O'Hanlon opines moderate to marked limitations in all areas of mental functioning. However, his assessed GAFs of 51 are consistent with only a moderate severity of symptoms and limitations. The claimant first sought treatment, in July 2003, and his condition was reported as "stable," by March 2004. Dr. O'Hanlon noted significant improvement in the claimant's mental impairments, with treatment, which is inconsistent with the marked limitations he opines in his assessment. Therefore, little weight is afforded Dr. O'Hanlon's opinion.

(Tr. 20).

As stated previously, an ALJ must give the opinion of a treating physician controlling weight only when it is supported by sufficient clinical findings and is consistent with the evidence. 20 C.F.R. § 404.1527(d). Here, the ALJ gave sufficient reasons for declining to adopt Dr. O'Hanlon's opinion. *Wilson*, 378 F.3d at 547. The ALJ pointed out that Dr. O'Hanlon had assigned Plaintiff a GAF score of 51, indicating that Plaintiff had only moderate limitations or impairment (Tr. 20). Additionally, the ALJ discussed that the treatment notes show Plaintiff's anxious and depressive symptoms stabilized with treatment (Tr. 20). After Dr. O'Hanlon prescribed Plaintiff Ambien and Zoloft during his first visit on September 11, 2003, he found in the next visit on October 7, 2003, that besides his anxiety and depression, Plaintiff's status was reported stabilized as to speech, behavior, sensorium, hallucination, insight and risk. His status as to anxiety and depression were assessed to be between "poorly stabilized" and "stabilized with outpatient treatment" (Tr. 270). Although Dr. O'Hanlon wrote in his March 22, 2004 report that Plaintiff's symptoms were not stable (Tr. 289), Plaintiff reported he felt stable on May 28, 2004 and that he had no adverse reactions to the medication (Tr. 308). Because Dr. O'Hanlon's records arguably do not support his opinion, the ALJ reasonably had a valid reason

to assign it little weight.

Furthermore, there was other evidence in the record which contradicted the assessment of Dr. O'Hanlon. The ALJ is charged with resolving conflicting opinions and with the ultimate determination of whether a claimant's impairments met or equal a listed impairment. *Richardson* 402 U.S. at 399; 20 C.F.R. § 404.1527(e)(2). Given the inconsistency of Dr. O'Hanlon's opinion with the record, the ALJ reasonably relied on the opinion of the state agency physicians that Plaintiff did not satisfy the "B" criteria. The regulations recognized that state agency physicians are "highly qualified physicians" who are also experts in Social Security disability evaluation. 20 C.F.R. § 416.927(f)(1). Here, the ALJ gave good reasons for giving little weight to Dr. O'Hanlon, and I conclude his adoption of the opinion of the state agency physicians was not error. *See Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990) (affirming the ALJ's rejection of treating psychiatrist opinion, which was based on over twenty visits, because the record as a whole did not support it, and the ALJ's adoption of state agency physician opinions).

III.    Did the ALJ err in finding that Plaintiff was not a credible witness?

Plaintiff challenges the ALJ's finding that Plaintiff's allegations regarding his pain and other symptoms were not fully credible (Tr. 21). On review, the ALJ's credibility determinations should be accorded "great weight and deference," particularly in light of the ALJ's opportunity to observe witnesses' demeanor during testimony. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Here, the ALJ found Plaintiff's allegations not fully credible based on the lack of objective findings, as well as other evidence, including his activities of daily living (Tr. 18).

23

The ALJ found the record "did not show abnormalities o[r] physical or objective findings to support the intensity and severity of discomfort" alleged by Plaintiff (Tr. 18). The ALJ points out that Plaintiff's range of motion was essentially normal. Indeed, on April 15, 2003, Dr. Holland found Plaintiff had normal range of motion in his hips, knees, and ankles (Tr. 193). One month later, on May 14, 2003, Plaintiff complained of left hip pain and Dr. Rizvi found he exhibited a reduced range of motion (Tr. 228-29). But in an examination on October 29, 2003, Dr. Cyleman noted that examination findings of Plaintiff's bones and joints were within normal limits (Tr. 279). The ALJ also recorded that X-rays and MRIs showed only "minimal desiccation and post-traumatic arthritis in the left foot" (Tr. 18, 231, 228). Plaintiff's foot was diagnosed with arthritis in January 2003 (Tr. 191), but Dr. Holland found that Plaintiff ambulated without difficulty (Tr. 193). Also, the May 2003 MRI of Plaintiff's lower back showed no hernia or disc bulging (Tr. 231). The ALJ additionally noted that treatment records from Plaintiff's primary care physicians showed rare episodes of gout and bronchitis (Tr. 188, 192, 273), a C-PAP machine successfully treated Plaintiff's sleep apnea (Tr. 295, 293), Plaintiff's diabetes had not progressed, and his cardiac examination was normal (Tr. 18, 151).

In addition to the objective medical evidence and treatment, the ALJ considered Plaintiff's daily activities and found that they detracted from his allegations of disabling symptoms. 20 C.F.R. § 416.929(c)(3)(i). Plaintiff suggests that the ALJ mischaracterized his testimony regarding his daily activities. Pl. Br. at 11. Although the ALJ did not elucidate on each portion of Plaintiff's testimony regarding his activities, he reasonably summarized that Plaintiff maintains the "ability to mow the lawn," and that he "occasionally attends church, drives, cooks, shops, reads, watches television, listens to the radio, and plays cards" (Tr. 18).

Plaintiff first challenges the ALJ's statement that Plaintiff had the "ability to mow the lawn." Pl. Br. At 11. Plaintiff cites portions of the record, specifically Plaintiff's daily activity reports to the state agency and his friend's report contained in exhibit 6E (Tr. 99-123), that reflect that he had difficulty mowing the lawn. Pl. Br. at 11. I do agree that the ALJ was less than fully accurate when he did not specifically point to the difficulty plaintiff had performing some of them. The ALJ's decision, however, shows that he considered these reports, as he cites to this exhibit at the conclusion of his discussion of this evidence (Tr. 18). The ALJ also cites to exhibit 7F (Tr. 21), the consultative psychological evaluation, in which Plaintiff told Mr. Caye of his difficulty mowing the lawn (Tr. 198). Having reviewed this evidence, the ALJ reasonably assessed that Plaintiff still maintained a certain level of ability for this activity and that this weighed against his reports of disabling symptoms.

The ALJ also noted his abilities to occasionally attend church (Tr. 118), drive (Tr. 363), cook (Tr. 118, 363), shop (Tr. 119), watch television (Tr. 122), and play cards (Tr. 111). Plaintiff contends that the ALJ's reliance on these activities was in error because Plaintiff has alleged difficulty performing them. But the ALJ is charged with looking to a claimant's daily activities to determine whether his claims of disability are credible, and the ALJ here did not err in pointing out that Plaintiff still performed these activities. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The [ALJ] justifiably considered Warner's ability to conduct daily life activities in the face of his claim of disabling pain"). Also, as discussed above, the ALJ reviewed the same evidence quoted by Plaintiff in his brief; thus, the ALJ was aware of Plaintiff's statements regarding difficulty. The ALJ, however, was not obligated to recount each and every part of this evidence. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("We

have repeatedly held that a written evaluation of every piece of evidence of testimony and submitted evidence is not required").   Plaintiff also contends that the "recreational" nature of these activities does not support that he can sustain work.  Pl. Br. at 12.  But the ALJ did not base his finding of non-disability on Plaintiff's daily activities alone.  The ALJ based his RFC determination on the medical evidence and his evaluation of the credibility of Plaintiff's subjective allegations (Tr. 18-19).  His activities of daily living were one factor in the credibility equation, which also included consideration of the medical evidence and treatment history (Tr. 19).  Although his daily activities did not on their own show great functional capacity, they supported the ALJ's conclusion that Plaintiff's allegations were not fully credible.

Plaintiff also suggests that the fact that he consistently sought treatment "enhanc[ed]" his credibility under Social Security 96-7p.  Pl. Br. at 12.  While the excerpt cited by Plaintiff explains that an individual's attempts to obtain treatment lend support to a claimant's allegations, following this excerpt, the SSR continues, "On the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints...."  *See* SSR 96-7p   Here, while Plaintiff visited his physicians, his treatment was not indicative of disability, as he was referred to no specialists except for his sleep apnea, he underwent minimal testing, and the testing he did undergo supported only minimal symptoms.

Plaintiff also argues that Plaintiff's statements regarding his symptoms should be found fully credible because medical sources have found him credible.  As Plaintiff points out, Dr. Caye found that Plaintiff was not malingering or dramatizing with respect to his mental limitations (Tr. 198), but he also concluded that Plaintiff had no mental limitations (Tr. 200).

26

Plaintiff points out that the state agency physician noted that Plaintiff was "credible," but Dr. Kourany ultimately found that Plaintiff could perform simple and repetitive work (Tr. 204, 217). Dr. Cyleman also opined his statements were "reasonable" in view of his observations and diagnoses (Tr. 253), but the ALJ did not assign this opinion controlling weight for the reasons discussed previously. *See infra* § I. Finally, although before the relevant time period, Dr. Wojcik, who examined Plaintiff for complaints of prostatitis in January 1998, noted in his report that he was concerned that there could be "some secondary gain" involved in Plaintiff's "persistence in stating that this pain is too severe for him to hold a job" (Tr. 165). For all of those reasons, I conclude the ALJ was not in error in his assessment that Plaintiff's subjective limitations were not totally credible.

<u>Conclusion</u>

Having carefully reviewed the administrative record and the briefs of the parties filed in

support of their respective motions, I conclude that there is substantial evidence in the record to

support the findings of the ALJ and the decision of the Commissioner denying the Plaintiff's

application for benefits. Accordingly, it is RECOMMENDED[6]:

    (1)      The plaintiff's motion for judgment on the pleadings (Doc. 16) be DENIED;

    (2)      The defendant's motion for summary judgment (Doc. 18) be GRANTED;

    (3)      A judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure AFFIRMING the Commissioner's decision which denied benefits to the plaintiff; and,

    (4)      This action be DISMISSED.

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[6]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 149, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).